Judge Rowan
delivered the opinion of the court.
On the 25th day of March, 1796, John Handley and Samuel Shackelford contracted by articles of agreement, under their respective signatures and seals, to the effect following: — -Handley sold to Shackelford 3000 acres of land, part of a tract of 10,000 acres, lying oh the lower side of Rough creek, opposite to and near the town of Hartford, which he represented in h’i3 covenant to have been patented in the name of (William) Fullerton. He represented also that he was entitled to a moiety thereof by conveyance from the said Fullerton. Shackelford was to pay him Z9O0 for the said 3000 acres, and was to have the remaining 2000 acres at Í60Q, if after seeing the land be liked it, and chose to take it. Shackelford paid him the Z900 for the 3000 acres, and after seeing the land, chose to take the remaining ⅞000 acres. The ZG00 for the 2000 acres was to he paid in seven years, with interest thereon at the rate of *497 live per centum for the six last years, whereby he became entitled to the whole 5000 acres, for which, on the 13th of February, 1800, Handley made him a conveyance with covenant of general warranty, which deed of conveyance Shackelford, on the next day, acknowledged in writing, under his hand and seal, was a full compliance by Handley with his part of their aforesaid agreement. — On the 19th of May, 1800, Shackelford and Ignatius Pigman contracted, by a written article, under their respective signatures and seals, to the effect following: — Shackelford let Pigman have the aforesaid 5000 acres, the moiety of the 10,000 tract, patented in the name of Fullerton, for which Pigman was to convey to him by deed, with general warranty, 1000 acres of land on Yellow creek, 3600 acres on Green river, (without warranty) and to pay him one hundred pounds in cash, and a horse; — Shackelford was, as soon as possible, to put the said Pigman in possession of all the interest he had in the aforesaid 5000 acres, with all the recourse he had on Handley. Pigman was to pay part of the Z100 down, and the balance in eight months. He was to convey the two aforesaid tracts upon demand. He paid $100 in cash and $100 in a horse. On the back of the above article was made the following endorsement, viz:—
“Sir — Please to make the deed to Ignatius Pigman, yon “ivas to make to me, and oblige yours,
“Samuel Shackelford.
“Capt. John Handley. — May 11th, 1800.”
And underneath the above, on the same instrument, was this other endorsement, viz:
“I do hereby agree to convey the within mentioned moie-f‘ty of 5000 acres of land to Mr. Ignatius Pigman.
“John Handlev, (l. s.)
“Test — Samuel Work.”
Pigman, sometime in the next year, discovered that the aforesaid tract of 10.000 acres had never been patented; that the plat and certificate of the survey thereof was still lying in the register’s office in the name of Fullerton, and on the 10 th of August in that year, communicated that matter in terms of much solicitude to Shackelford, with an earnest request that he should procure the emanation of the patent, as of the date when it should have been issued.
On the 13th of June, 1803, Shackelford addressed a letter to Pigman, which is exhibited by Handley, and made part of his answer, which commences as follows- — “Sir, Í *498 «here agam take the liberty to repeat'the subject of tfijcr. “5000 acres of land I formerly purchased from John Hand-“ley, and since sold to you; Handley agrees, provided 1 will «cancel so far as relates io the 2000 acres, he Will take it, “&c.”' In this letter, Shackelford offered to give up to Pigman all the money which was due, and to give him the 1000’acres on Yellow creek, if he would come into the measure; and from this letter it appeared that Pigman had not conveyed eitbér of the aforesaid tracts to Shackelford, or paid him the balance of the 1100.
In the fall of the year 1803, Pigman became insolvent, and left the state of Kentucky without having cancelled his contract with Shackelford, or conveyed to him either of the two aforesaid tracts of land, or paid him any more money. A patent issued to Fullerton for the aforesaid 10,00(⅜ acres on the8lh day of May, 1804; and the 10th day of July, 1804, Handley acknowledged in the clerk’s office of Ohio county, before the clerk thereof, a deed of conveyance to Pigman for 4500 acres, part of the aforesaid 5000 acres, and on the 20th day of February, T806, conveyed to Daniel Barry 500' acres thereof, in discharge of a bond executed for that quantity by Pigman to Walls and Joseph, and by them assigned to the said Barry; — Much of the 500⅞ acres aforesaid was covéred by older patents than Fullerton’s. On the deed of conveyance from Handley to Pig-man, being executed, Slatler, the stm-in-law of Pigman, endorsed upon the article of agreement between him and Shackelford, to the following effect, viz: — -
“Received of capt. John Handley a deed for the within “moiety.of 5000 acres, bearing date July the 5th,,1805, “and said Shackelford exonerated, except he has failed in “paying the taxes on the said land, from the year 1795, in' “•which case 1 hold him liable.
“Ignatius Pigman,
“By his attorney Stephen Slatler”
Handley commenced suit at law’ágainst Shackelford iii the Lincoln circuit court, upon the article of agreement aforesaid, and obtained a verdict and judgment against him iorMOO, the price of the 2000 acres, with interest thereon from the 26th March, 1797. Shackelford filed bis bill enjoining the judgment aforesaid, alledging, in addition to the above facts, that he was prevented by his misrepresentation of the title to the land, at the time he sold'to Pigman, from exacting a compliance on the part of Pigman. That- *499 the misrepresentation made by him to Pigman was super-induced by the misrepresentation made by Handley, in which he confided, and by which he was influenced to make the contract with him. That Handley bad not conveyed effectively the land in question, either to him or to Pigman, so as to enable him (o exact from Pigman the consideration agreed by him to be paid therefor. That the conveyances to Pigman and to Barry were collusive and fraudulent, made with a knqwiedge that he had not been paid, and that Pigman had become insolvent and fled the country.
Handley answered the bill; admitted that he had made the representations as to the title of the.land, but insisted that they were honestly made, under the honest belief that the facts corresponded therewith. That the error was, on his part, innocent and unintentional, and that his covenant of general warranty, and his capacity to comply therewith, met and silenced all complaint on the ground that there were elder adversary titles to the land. He urged also, that the transfer by Shackelford of his interest in the land, and of his recourse against him toPigman, taken together with the endorsements thereon, and the conveyances to Pig-man and to Barry, and the acceptance of the conveyance to Pigman by his agent Slatler, had also silenced every complaint on the ground of his innocent misrepresentation of the title, and had removed all obstruction to the effectu-ation of his judgment against Shackelford,
The cause was removed, by the consent of parties, from the Lincoln to the Mercer circuit pourt, and afterwards by a judge’s order, upop the petition of Handley, to the Hardin circuit court, where, after various amended bib's and answers, and a revival by and in the names of Shackelford’s representatives, (he having departed this life) it was finally tried, and a decree pronounced, dissolving the injunction and dismissing the bill, with damages a»d costs; from which pomplainants prayed this appeal.
They alledge that it is erroneous and unjustThat the misrepresentation of Handley, in the original contract, has produced an afflicting result, which ought to be sustained by him, but which, by the decree, is fastened upon them. On the other band it is urged to be correct, on the ground that Handley, in whose favor it is, acted fairly, and with good faith, throughout the transaction upon which if is based. That his representation, at the time of, and in the *500 contract, that the land which he sold therein, had been patented in the name of Fullerton, and that he had title thereto, was made under the honest conviction that such were the facts. That he had no intention to deceive, and that as to those facts, he was himself deceived.
A «usre-ofab material fact (be it ther fraudu-cent,°if itpro-duces mis. Chifia t0 lhe ty) aiikePvi" tiates a contract; the oiu ° nrpoe tani as it may affect themo-of therein" not as ⅞¾ fects the con tract; Aide ■vs'Seemiss!
It may be, and probably is, true, that Handley was, at the time of the contract, unconcious that the facts of the did not correspond with his representation of them; but the chancellor does not regard alone the motives which influenced the agent, nor the consciousness under which he acted. The effects and consequences of the act, are mainly considered by him in this class of case. The act, whatever nlay *ts character as to motive, to render the agent irresponsible, should not be injurious to another The motive 0f an act relates to the agent, and may be of importance in ascertaining his moral character. The act relates to the subject, and is to be considered, as to its injurious effects upon him, abstractedly from the motives which led to orpro-^uce^ '*• “«c utere ítto, mí alienum non ledasis a sound maxim deduced from the associate state of man, and of extensive influence upon human transaction. You may say or (]0 wbatyou please, if you do not thereby injure another. circle of your rights is limited by that of the equal rights of your neighbor; when you transcend that limit, you encroach upon his rights, and must answer for the encroachment to the extent of the injury inflicted thereby; and this, whatever may have been your motive, whether virtuous or vicious, the injury is the same to him in either case. Confidence between man and man is indispensibly necessary to social intercourse, and the transaction of business — it is the postúlala upon which society is constructed, and without which it could not exist even for a moment; but confidence presupposes good faith, and cannot exist without it. Man is therefore constrained to confide in the statement or representation of his fellow man in every transaction ■ which he may have with him; and hence the necessity, that the statement, 'or representation, should be correct. The injury therefore superinduced by an erroneous statement, deliberately made, must be repaired by the person making it; and this upon a principle of primary and necessary justice —otherwise all the points of social contact, instead of points of coherence, would become points of repulsion, and society would hasten to cease.
In a purchase of land in any country, and more particu *501 larly in this, where conflicting titles have afflicted the community, the purchaser, it may be reasonably supposed, would first enquire into the state of the title thereto, and would be mainly influenced in making the purchase, by the representations-of the vendor on that subject. It cannot be presumed that Shackelford would, in this case, have made the purchase, if Handley, instead of telling him that the land was patented, and that his title thereto was good; had told lum it was not patented, and would not be tor eight years to come, and that a great part of it was covered by adversary patents. Nor can it be supposed that Pigman would have purchased of Shackelford had these facts been disclosed to him. But the error of Shackelford, in his transaction with Pigman, was occasioned by the previous error of Handley, in relation to the same subject, and is an error for which Handley must, on very obvious principles, be responsible. ■ - ”
the f t rnisrepresen-ted be such as probably enced - the contract,itis material,
a t a ⅛ lai)*ls erma(jg before the é-manamn of ⅛.
a discharge ^neentoy the influence °f1,13 ihe informed will must concur with tte »e%
An obligee makfng^’he same misrepresentation ^adeJo-tflm »¡¡h regard to• the title, ⅛ ésact ' p;,v. ment fron)i the assignee, even tho’ the obligor endorse on til: bond that lie will perforin the condition in Favor of the assignee.
*501 ” . It may be said that the acknowledgement of Shackelford that the deed made by Handley to him in the year 1800 for this land, was a full compliance on his part, with ,their agreement, and ought to absolve him from this But this deed was made by Handley and received by Shack-elford near four years before the land comprised therein was patented, and of course passed no title; — besides, it was received, and the acknowledgement aforesaid made, under the illusion as to the state of the title superinduced by the misrepresentation of Handley in the original contract in relation thereto. It w:as never recorded, and Handley him-«elf evinced, by his own subsequent acts, and those too on which lie chiefly relies in this case, that he thought it a múde act. / ■ ‘ ' '
■ But it is considered that the sale from Shackelford to Pigman was, virtually, a transfer of Handley’s obligation for the land, and nothing more, and that Handley’s endorsed undertaking thereon, to comply therewith, released Shackelford,' and left the transaction exclusively between Handley and Pigman. It must not be forgotten that this transfer by Shackleford, and endorsement by Handley, were made under the illusion, and accompanied by the misrepresentation as to title, which prevailed when the original contract was made, and pervaded that contract. ,It had not thenTreen discovered that the land had pot been patented, and that it was considerably occupied by adversary patents; and that Pigman would not, on that account, perform his *502 part of the agreement with Shackelford, and could not be compelled to do so. Handley’s posture, therefore, in relation to Shackleford, cannot be thereby improved, nor can hisliabilty to him, be thereby diminished, for his assumption to Pigman, did not remove or diminish Shackelford’s liability, on account of the misrepresentation made by him as to the title of the land, at the time of his sale thereof to Pigman, nor did it remove or diminish the obstruction then resulting, to his exaction of payment therfor, from Pigman.
If the obli-gor conveys to the assign-ee, knowing him to be insolvent, and that the assignor h;’S not been psid ’.is fraudulent.
The repetition of erroneous or fraudulent acts, no matter how multiplied, by the same parties, in relation to the same subject, cannot vary or • extinguish, either their respective rights or liabilities. The repetition of a §ip is not considered, in any system of theology, as an expiation thereof; not more, in the eye of reason, can the repetition of an offence, against a government, or of an injury against an individual, be said to absolve the offending person and píate the offence or injury. A person who has been injured by the mistake or fraud of another, may, after he has become conscious thereof, absolve the offending; party and affirm the transaction in which the mistake or fraud exist ted, and this affirmance and absolution may, as well be inferred from hfe subsequent acts in relation to the transaction, as it may be proved in any other way^r-but in either and every shape of case, the inquiry is, has the party displayed an absolving or affirming will? A person cannot yveil be supposed to have expressed a will or consent, in relation to matters of which he had no consciousness or knowledge at the time. Indeed, the exercise of will presupposes a knowledge, by the person exercising it, of the matters upon which it is exercised, and the obligation incurred by its exercise, is to be 'inferred from the state of the facts of which he had knowledge at the time, and must be commeni surate therewith.
It cannot he supposed that Shackelford, at the time those acts were performed, intended thereby to reiinguish to Pig-nv&n the consideration for which he sold him the land, or that he intended to do an act whereby his right to demand and enforce the payment thereof, should be diminished or extinguished. It cannot-be believed, that he thereby intended to subject himself to the payment of $4,800 to Handley for nothing. The conveyances afterwards made by Handley to Pigman, instead of silencing the complaints of Shackelford,were calculated to aggravate them. Hand- *503 ley and Pigman were both residents of Ohio county; Shac-kelford resided in Lincoln, a county remote from that of their residence — they had all discovered the fatal error under which their contracts had been made; they had got to know that the land had not been patented to Fullerton, and Handley, from the letter incorporated in his answer, knew that Pigman had not paid Shackelford therefor. That letter evinces considerable zeal on the part of Shackelford to have the matter arranged, to the mutual satisfaction of all concerned, by cancelling their contracts or otherwise. The zeal of Shackelford was evidently not a zeal to incur, but to avoid loss. The conveyance, therefore, of the land by Handley to Pigman and Barry, when he knew it had not been paid for, between one and two year* after Pigman had become insolvent, and left the country, was, when it is considered that his misrepresentations as to the title of the land, had prevented Shackelford from receiving or exacting the payment, worse than erroneous, it was fkaudulext. If the decree be sustained, Handley will receive from Shackelford $4,800, with interest on ⅜?00() thereof, from the 25th of March, 1796, and upon $1800, the balance thereof, from the 25th day of March, 1797, without any equivalent or consideration whatever. This would be against conscience, and in violation of a favorite maxim in both courts — that there must he, m every contract, to render it valid, a good, or a valuable consideration. The “quid pro quo,” is the delight of the law, so much so, that out of the various considerations which influence human action, it has selected and considered the two foregoing only — the good and the valuable. Indeed, so adhesive is the llquid pro quo” principle, that while it will not lend its aid to the donor, to reclaim an executed gift — It refuses its assistance to the enforcement of a gift executory — it permits generosity, but exacts justice— you may be generous — you must be .Just. But Handley’s claim to the above amount, is asserted on the basis of contract, not of gift — on the basis of justice, not of generosity. If, in the latter character, it must, as to the $2000, be most certainly unavailing. But claiming a contract, and having, by his own erroneous, if hot fraudulent, acts,, withdrawn or diverted, irreclaimably, the consideration upon which it was based — his claim cannot be iess unavailing. The chancellor will not permit the absence of consideration, to be supplied by the artifice or dinning of a party to a contract. He' will distinguish be *504 fwecn tiie factitious and native complexions of the transao tions which are submittted to his consideration. He will not mistake the mimicries of fraud or of art, however striking the likeness may seem, for the insignia or impresses of honest realities. Á sound transaction needs no artifice to recommend it, and none should succeed in recommending a windshaken or rotten one.
There bea “qu-dpru ?'»” in every exe':utory chancery wit) not decree it.
a vendor misrepiesai-⅛¶ the state ih»liC '⅛⅛ soíi, wUl be res r.tmed »coo emorc-⅛'⅞ sale, ⅛ with general .warranty.
■ Shackelford was, by contract with Handley, to receive from him 5000 acres of land, as the consideration of $5000, to be paid by him to Handley. Handley had received 03000, and obtained a decree for the remaining $2000, Süackelford has not received the land, or any equivalent for it, nor can he ever receive either. If the beneficial effect of this contract had become lost to Shackelford by his consent, or his crime, by his own will, or his own act, he should abide the loss. But if the loss lias been produced, neither by his will nor his act, but by the loill and the acts of Handley, then Handley should sustain the ioss. But even the deed which he made to Pigman, was not in compliance with his contract. He.was, by contract, to convey with covenant of genera! warranty. The covenant, in the conveyance made, is not of that character. It contains an injurious exception, not warranted by the contract — an exception, of which Pigman may avail himself, to refuse payment to Shackelford. The conveyance, therefore, is neither in compliance with his engagement to Shackelford, nor with Shackelford’s engagement to Pigman. Nor can this couri (¾⅛ that his contract to convey with general warranty, excuses him ior not disclosing,to bhackeltord at the time-of the contract, the existing adversary claims, and their character as far as he knew them. The suggeslio falsi vel suppressio veri, is as availing to resist the specific execution of a general warranty, as a special warranty contract, or to rescind the one as the other. It may not be eventually as injurious in the one as the other; but it may be injurious in both, and when it has intervened so as to produce injury, the chancellor will refuse to enforce specifically, or will rescind, without stopping to estimate the comparative extent of injury. But it is urged that the state of things is so altered in this case, that there ought not to be a rescission of the contract — that the chancellor will not vacate the contract, unless he can place the parties in slain quo, which cannot be done in this case. It is true, that where the injured party has, by hw sale or concurrent *505 act, changed (he state of the affair, or the posture of the parlies essentially, the chancellor will not rescind. But when the change has been produced by the sole act of the delinquent, without the concurrence in act or will, of the person injured, it forms no objection with the chancellor. The change in this case was produced by Handley alone. The conveyances to Pigman and to Barry, were made by him without the consent, and against the will, of Shackel-ford, and being voluntary acts of his own, he must incur the consequences.
Liltdl for appellants, Wickliffe lor appellees.
Chancery will vacate a fraudulent contract., tuo* t e parties r.annoi be placed in statu quo, if that slate ofthmgs has been produced wrh-out the act of he injured party.
If it be said that he will sustain an entire loss of 5000 acres of land, it may be replied, first, that from the state oí his titl/, and of the adversary titles thereto, it is by no means certain that the loss would be considerable; and again, that if he should sustain the loss of the whole land, it is the result of acts of his own, all calculated, and the last of them intended, to inflict a loss to that extent upon Shackelford. It is, therefore, the opinion, decree and order of this court, that the decree of the court below be set aside, vacated and annulled, and that a decree be entered up by that court, whereby the contracts between the said Shackelford and the said Handley, and the said Shackel-ford and the said Pigman, and the said Handley and the said Pigman, in relation to the land aforesaid, shall be respectively rescinded; and whereby the injunction of the said Shackelford shall be made perpetua!, and the defendants (representatives of the said Handley) shall be decreed to pay to the said complainants $2800, with interest at 5 per cent, from the 25th day of March, 1796, till paid; and whereby the conveyance for 4500 acres of land, made by Handley to Pigman, shall be vacated; and whereby the said Pigman shall be decreed to pay to the representatives of the said Handley $500, the value of 500 acres of the land conveyed by Handley to Barry, &c/at Pigman’s request, after deducting the $200 paid by Pigman to Shac-kelford, with interest at the rate of 6 per cent, from the 10th day of July, 1804, until paid; and awarding the complainants their cost in that court. And it is further decreed and ordered, that complainants recover of ilef’ts their cost?,